## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

PAMELA S. WOODRUFF,
    Plaintiff,

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:16-cv-798

Black, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Pamela Woodruff brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying plaintiff's applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI"). This matter is before the Court on plaintiff's statement of

errors (Doc. 9), the Commissioner's response in opposition (Doc. 14), and plaintiff's reply

memorandum (Doc. 15).

## I. Procedural Background

Plaintiff filed her applications for DIB and SSI in October 2012, alleging disability since

November 30, 2011 due to diabetes, high blood pressure, bipolar disorder, lower back disc

disease, chronic obstructive pulmonary disorder ("COPD"), migraines, and back problems.

Plaintiff's applications were denied initially and upon reconsideration. Plaintiff, through

counsel, requested and was granted a *de novo* video hearing before administrative law judge

("ALJ") Deanna L. Sokolski. Plaintiff and a vocational expert ("VE") appeared and testified at

the ALJ hearing. On October 29, 2015, the ALJ issued a decision denying plaintiff's

applications. Plaintiff's request for review by the Appeals Council was denied, making the

ALJ's decision the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 416.920(a)(4)(i)-(v), 416.920(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform

2

the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act through June 30, 2019.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since November 30, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The [plaintiff] has the following severe impairments: Degenerative disc disease, chronic obstructive pulmonary disease, affective disorder, and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the undersigned finds that the [plaintiff] has the residual functional capacity [("RFC")] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except never climb ladders, ropes, and scaffolds; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; avoid all exposure to workplace hazards such as unprotected heights and dangerous moving machinery; avoid even moderate exposure to pulmonary irritants such as fumes, odors, dusts, gases, and poor ventilation; avoid concentrated exposure to temperature extremes and humidity; and perform simple, routine, repetitive tasks performed in a work environment free of fast paced production requirements, involving only simple work-related decisions with few if any workplace changes with occasional interaction with supervisors and coworkers and superficial interaction with the public as part of job duties.
>
> 6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[1]

---

[1] Plaintiff's past relevant work was as a nurse aide, a medium, semiskilled position; a sales clerk, a light (performed medium), semiskilled position; and a stock clerk, a heavy (performed medium), semiskilled position. (Tr. 31, 88).

7. The [plaintiff] was born [in] 1962 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The [plaintiff] subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [plaintiff] is "not disabled," whether or not [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[2]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from November 30, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 20-32).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229

---

[2] The ALJ relied on the VE's testimony to find that plaintiff is able to perform representative light jobs such as sorter (90,000 jobs nationally), packer (150,000 jobs nationally), and cleaner (100,000 jobs nationally). (Tr. 32, 90).

(1938)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

  The Court must also determine whether the ALJ applied the correct legal standards in the disability determination.  Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).  *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

  **D.  Medical Evidence**

*Dr. Atluri*

  Pain management specialist Sairam Atluri, M.D., first saw plaintiff in April 2009.  (Tr. 840).  Plaintiff reported bilateral lower back pain that also radiated down the left leg.  The pain started in February 2008 after a workplace injury.  Dr. Atluri noted that because of the pain, plaintiff was "able to function only 30-40% of her full function capability."  (*Id.*).  On physical examination, Dr. Atluri noted "[m]ild tenderness . . . in the spinous processes, paraspinal muscles, facets, and [sacroiliac] joints."  (Tr. 841).  Dr. Atluri diagnosed low back pain with lumbar sprain and prescribed a Lidoderm patch (numbing agent).  Dr. Atluri noted that physical therapy did not help and plaintiff was "not too keen on interventional therapies" such as facet

5

joint injections. (*Id.*). Dr. Atluri noted that plaintiff had received temporary relief from epidural injections. (*Id.*).

Dr. Atluri did not see plaintiff again until May 2014. (Tr. 842). Plaintiff complained of lower back pain radiating down the legs. The pain was worse on the right than the left. Plaintiff complained of numbness, tingling, and weakness in the right leg. Dr. Atluri noted that because of the pain, plaintiff was "able to function only 40% of her full function capacity." (*Id.*). On physical examination, Dr. Atluri noted that "[n]o tenderness was seen in the spinous processes, paraspinal muscles, facets, or [sacroiliac] joints bilaterally." (Tr. 843). Plaintiff had normal motor strength in both legs but decreased sensation in her right lower leg. Dr. Atluri diagnosed low back pain with disc displacement, disc degeneration, spinal stenosis, and radiculopathy. He prescribed low-dose opioids and "other muscle relaxants and neuralgics." (*Id.*). He noted that plaintiff was "not too keen on interventions" and did "not want surgical options." (*Id.*).

On September 9, 2014, Dr. Atluri noted that opioid medication had improved her ability to perform various activities of daily living. (Tr. 848). On lumbar examination, Dr. Atluri noted that there was no tenderness, motor strength was normal, and there were no sensory deficits. Dr. Atluri noted that plaintiff had received temporary relief from an epidural injection and was "not interested in physical therapy." (*Id.*). On September 11, 2014, Dr. Atluri administered a lumbar interlaminar epidural injection. (Tr. 845). On September 17, 2014, Dr. Atluri noted that plaintiff had "temporary relief" from the injection. (Tr. 844). On September 25, 2014, Dr. Atluri administered a lumbar transforaminal epidural injection. (Tr. 846).

Dr. Atluri's lumbar examination on October 14, 2014 revealed no tenderness in the spinous processes but did reveal tenderness of the paraspinal muscles, facet joints, and sacroiliac joints. (Tr. 849). Motor strength was normal and there were no sensory deficits of the lower

extremities. (*Id.*). On October 23, 2014, Dr. Atluri administered lumbar facet joint injections. (Tr. 847). On November 10, 2014, Dr. Atluri noted that epidural injections "helped with leg pain" and facet injections "helped a lot temp[orarily]." (Tr. 850). Physical examinations on November 10 and December 3, 2014 again showed tenderness of the paraspinal muscles, facet joints, and sacroiliac joints, but normal motor strength and sensation in the lower extremities. (Tr. 850-51). Dr. Atluri noted on December 3, 2014 that a nerve block of the medial branch provided 100% relief for 12 hours. (Tr. 851).

On December 24, 2014, Dr. Atluri performed radiofrequency neurotomy of medial branches to block facet joints. (Tr. 873). Dr. Atluri's examination on January 7, 2015 showed no tenderness in the spinous processes, paraspinal muscles, facet joints, or sacroiliac joints. (Tr. 969). Plaintiff had normal motor strength and sensation in the lower extremities. (Tr. 969-70). Dr. Atluri noted that plaintiff was "40% better" after the radiofrequency neurotomy procedure. (Tr. 970). Dr. Atluri noted that Percocet was "helping without side effects" and he decreased her dosage to once per day. (*Id.*).

On January 22, 2015, plaintiff saw Catherine Ellis, a nurse practitioner in Dr. Atluri's practice. (Tr. 965). On examination, Nurse Ellis noted tenderness in the spinous process, paraspinal muscles, right facet joint, and right sacroiliac joint. (Tr. 967). Plaintiff had normal motor strength and sensation in the lower extremities. Nurse Ellis noted that plaintiff wished to proceed with additional facet joint injections. (*Id.*).

*Dr. Cone*

In October 2011, plaintiff saw psychiatrist Teresa Cone, M.D., at Batavia Family Practice. (Tr. 1018). Plaintiff's mental status examination was unremarkable. (Tr. 1016). Dr. Cone noted that plaintiff was "doing well on current regimen" of Prozac (antidepressant),

7

Risperdal (antipsychotic used to treat bipolar disorder), and Lamictal (an anticonvulsant used to treat bipolar disorder). (Tr. 1016-17). Dr. Cone diagnosed a mood disorder and assessed a GAF score of 65.[3] (*Id.*).

Plaintiff presented to Dr. Cone in January 2012 with severe depression. (Tr. 1019). Dr. Cone continued plaintiff on Prozac and Lamictal, discontinued Risperdal, and prescribed hydroxyzine (an anti-anxiety drug). (*Id.*). On mental status examination, Dr. Cone noted that plaintiff's mood was anxious and depressed. (Tr. 1022).

In March 2012, plaintiff presented with mild depression. (Tr. 1025). Dr. Cone discontinued hydroxyzine because of side effects and started plaintiff on Buspar (an anti-anxiety drug). (*Id.*). Plaintiff's mental status examination was unremarkable. (Tr. 1029). In April 2012, plaintiff presented with mild depression and Dr. Cone continued her medication regimen. (Tr. 1032). In June 2012, plaintiff reported being more depressed but having improved anxiety with Buspar. (Tr. 1039). Dr. Cone increased plaintiff's Prozac dosage from 40 milligrams to 60 milligrams. (*Id.*). On mental status examination, plaintiff's mood was depressed. (Tr. 1043). Dr. Cone ended their treatment relationship but gave plaintiff a list of other psychiatrists. (Tr. 1039). Dr. Cone noted that until plaintiff found a new psychiatrist, she would follow up with Roger Chang, M.D., a primary care physician in Dr. Cone's practice. (*See id.*).

---

[3] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. Individuals with GAF scores of 61 to 70 have "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

*Dr. Chang*

Plaintiff saw Dr. Chang in December 2012 for a checkup appointment on plaintiff's diabetes, hypertension, irritable bowel syndrome, headaches, and mood disorder. (Tr. 600). Plaintiff reported that her mood disorder was stable on her current medications of Buspar, Prozac, and Lamictal. (Tr. 600, 602-03). On examination, plaintiff's lungs were clear to auscultation and her respiratory effort was normal. (Tr. 602). On January 14, 2013, Valeria Bisig, a nurse practitioner in Dr. Chang's practice, treated plaintiff for a sinus infection. (Tr. 597, 599). Nurse Bisig noted that on examination, moderate wheezing was present bilaterally but plaintiff's respiratory effort was normal. (Tr. 597). On January 22, 2013, Dr. Chang noted that on examination, bilateral diffuse rhonchi were present but plaintiff's respiratory effort was normal. (Tr. 593). Dr. Chang diagnosed plaintiff with acute bronchitis. (*Id.*).

On March 4, 2013, Dr. Chang treated plaintiff for skin irritation and a urinary tract infection. (Tr. 583). On examination, plaintiff's lungs were clear to auscultation and her respiratory effort was normal. (Tr. 584). On March 20, 2013, Franklin Baker, a physician assistant in Dr. Chang's practice, saw plaintiff for continued urinary problems. (Tr. 579, 582). On physical examination, Mr. Baker noted tenderness in plaintiff's lumbar spine. (Tr. 580).

On April 12, 2013, Dr. Chang treated plaintiff for lower back pain and cold symptoms. (Tr. 575). Dr. Chang noted that plaintiff's back pain had been treated in the past as part of a worker's compensation case, but the case was closed after plaintiff failed to go to pain management. (*Id.*). On examination, plaintiff's lungs were clear to auscultation and her respiratory effort was normal. (Tr. 576). Dr. Chang noted no tenderness in the lumbar spine and indicated that mobility and curvature of the spine were normal. (*Id.*). Plaintiff's deep tendon reflexes were preserved and symmetric. (Tr. 577). Dr. Chang noted that plaintiff's 2008 MRI of

the spine showed "very minimal degeneration." (*Id.*).  Dr. Chang recommended that plaintiff "do back stretches."  (*Id.*).

On July 12, 2013, Dr. Chang noted that plaintiff's depression and moods were stable, but plaintiff reported having more stress recently and poor sleep. (Tr. 705).  In reviewing plaintiff's neurological and psychological symptoms, Dr. Chang noted that plaintiff was negative for anxiety and depression. (Tr. 706).  Dr. Chang also noted that plaintiff was negative for symptoms of cough, known tuberculosis exposure, and wheezing.  On examination, plaintiff's lungs were clear to auscultation and her respiratory effort was normal.  (*Id.*).  Her mood and affect were described as appropriate. (Tr. 707).

After plaintiff's July 12, 2013 appointment, Dr. Chang partially completed a "Physical Residual Function Capacity Medical Source Statement." (Tr. 623-26).  Dr. Chang left blank questions concerning: (1) the frequency and length of his contact with plaintiff; (2) diagnoses; (3) prognosis; (4) a list of plaintiff's symptoms; (5) a description of plaintiff's pain; (6) plaintiff's most significant clinical findings and objective signs; and (7) a list of plaintiff's medication side effects. (Tr. 623).  Dr. Chang also left blank the majority of questions related to plaintiff's physical RFC, including questions about plaintiff's ability to lift, carry, walk, climb steps, balance, stoop, crouch, bend, sit, and stand. (*See* Tr. 623-24).  Dr. Chang opined that plaintiff would not need an assistive device to stand and walk. (Tr. 625).  Dr. Chang opined that plaintiff would be able to push and pull arm or leg controls from a sitting position for six or more hours per day.  Dr. Chang opined that plaintiff had the ability to climb stairs. (*Id.*).

As to plaintiff's psychological limitations, Dr. Chang opined that plaintiff's depression and anxiety caused functional limitations. (*Id.*).  He indicated that plaintiff would "frequently" experience both pain and stress severe enough to interfere with the attention and concentration

required to perform simple works tasks. (*Id.*). Dr. Chang indicated that plaintiff's limitations would cause her to be "off task" for 25% of the workday. (Tr. 626). He indicated that plaintiff would be unable to complete an eight hour workday at least five days per month. He believed plaintiff would perform her job at 70% efficiency compared to an average worker. Dr. Chang opined that plaintiff would be unable to obtain or retain full-time work in a competitive work environment because "she has limited ability to handle stress." (*Id.*). Dr. Chang indicated that he was best able to discuss plaintiff's emotional aspects and would need to conduct a functional capacity examination to assess plaintiff's physical abilities. (*Id.*).

On August 12, 2013, Dr. Chang treated plaintiff for a urinary tract infection. (Tr. 709). On August 29, 2013, Dr. Chang treated plaintiff for an upper respiratory infection. (Tr. 712). On examination, Dr. Chang noted bilateral moderate diffuse wheezing but normal respiratory effort. (Tr. 713). Dr. Chang diagnosed asthma exacerbation and prescribed prednisone and an antibiotic. (*Id.*). In September 2013, Dr. Chang treated plaintiff for an upper respiratory infection. (Tr. 715). On examination, plaintiff's lungs were clear to auscultation and her respiratory effort was normal. (Tr. 716). Dr. Chang diagnosed acute sinusitis and allergic rhinitis and prescribed an antibiotic and a nasal corticosteroid. (*Id.*). In October 2013, Dr. Chang saw plaintiff for a COPD follow-up. (Tr. 718). On examination, plaintiff's lungs were clear to auscultation and her respiratory effort was normal. (Tr. 720). Dr. Chang prescribed Naprosyn (a nonsteroidal anti-inflammatory drug) "for probable pleurisy." (Tr. 721).

In November 2013, plaintiff presented to Dr. Chang with a six-month history of lower back pain after a hard fall. (Tr. 723). The pain had radiated to the right calf, foot, and thigh. Plaintiff reported that her symptoms were aggravated by standing and included numbness in the lower extremity and weakness in the hip. (*Id.*). On examination, Dr. Chang noted that there was

no abnormal curvature in plaintiff's spine. (Tr. 724). Plaintiff's spine was positive for posterior tenderness and lumbar palpation revealed right tenderness. Dr. Chang ordered x-rays and prescribed Vicodin for plaintiff's pain. (*Id.*).

In February 2014, Dr. Chang treated plaintiff for kidney stones. (Tr. 727). On physical examination, plaintiff's lungs were clear to auscultation and her respiratory effort was normal. (*Id.*). In March 2014, plaintiff reported to Dr. Chang that her back pain was worsening and was aggravated by bending, lifting, standing, and twisting. (Tr. 729). Plaintiff reported that her symptoms were relieved by ice. Plaintiff reported that her mood disorder remained stable on her current medications. (*Id.*). On examination, Dr. Chang noted that respiratory auscultation and effort were normal. (Tr. 730). Dr. Chang ordered an MRI of plaintiff's lumbar spine. (Tr. 731). In April 2014, Dr. Chang referred plaintiff to Dr. Atluri for epidural steroids to treat plaintiff's degenerative disc disease. (Tr. 734).

On May 7, 2014, Dr. Chang treated plaintiff for a sinus infection. (Tr. 736). On examination, Dr. Chang noted mild wheezing on plaintiff's right side but her respiratory effort was normal. (Tr. 737). Dr. Chang prescribed an antibiotic. (*Id.*). On May 15, 2014, Dr. Chang treated plaintiff for an upper respiratory infection that was "[n]ot helped much" by antibiotics. (Tr. 739). On examination, Dr. Chang noted bilateral moderate diffuse wheezing but plaintiff's respiratory effort was normal. (Tr. 740). Dr. Chang diagnosed asthma exacerbation and prescribed prednisone. (*Id.*). On May 28, 2014, Shoba Rao, M.D., a physician in Dr. Chang's practice, treated plaintiff for cough and shortness of breath. (Tr. 742, 744). Dr. Rao noted that plaintiff smoked four to five cigarettes a day. (Tr. 742). On examination, Dr. Rao noted decreased breath sounds bilaterally but normal respiratory effort. (Tr. 743). Dr. Rao prescribed a breathing treatment in the office, completion of prednisone, and an antibiotic. (*Id.*).

In July 2014, plaintiff complained of dry cough, wheezing, and musculoskeletal pain in the left leg. (Tr. 852). On examination, Dr. Chang noted normal auscultation and respiratory effort. (Tr. 856). Dr. Chang ordered electromyography of plaintiff's leg muscles, the results of which were normal. (*See* Tr. 857, 933-34).

In September 2014, Dr. Chang noted that plaintiff did "not present with anxious/fearful thoughts, depressed mood or thoughts of death or suicide." (Tr. 859). Plaintiff reported that her functioning was "somewhat difficult." (*Id.*). Dr. Chang assessed a GAF score of 65. Plaintiff also complained of back pain, right flank pain, and shortness of breath with exertion and wheezing. (*Id.*). On examination, Dr. Chang noted no abnormal findings. (Tr. 862).

In December 2014, plaintiff complained of upper respiratory symptoms and increased anxiety related to "stress for having surgery, breathing problems." (Tr. 865). On examination, Dr. Chang noted that plaintiff's auscultation and respiratory effort were normal and her mood and affect were appropriate. (Tr. 867). Dr. Chang increased the dosage of plaintiff's Prozac prescription from 40 milligrams to 80 milligrams daily. (Tr. 867-68). Dr. Chang also started plaintiff on Ativan (benzodiazepine used to treat anxiety disorders). (Tr. 867). Dr. Chang provided plaintiff a referral for mental health treatment from LifePoint Solutions. (*Id.*).

In January 2015, plaintiff complained of anxiety and depression. (Tr. 1007). On examination, Dr. Chang noted rhonchi in both lungs. (Tr. 1009). He described plaintiff's speech as "pressured" and her mood as "irritable." (*Id.*). Dr. Chang prescribed an antibiotic for bronchitis. (*Id.*). In February 2015, plaintiff complained of cough, sinus pressure, and wheezing that had not improved with antibiotics. (Tr. 1002). On examination, plaintiff's auscultation and respiratory effort were normal. (Tr. 1004). Her mood and affect were appropriate. Dr. Chang prescribed prednisone and an antibiotic. (*Id.*).

*Dr. Wischer Bailey*

Consultative physician Jennifer Wischer Bailey, M.D., examined plaintiff for disability purposes on February 6, 2013. (Tr. 558-66). Plaintiff's chief complaint was a five-year history of shortness of breath that gradually increased in severity over that time. (Tr. 558). Plaintiff reported that she was able to walk on level terrain for approximately one hour without shortness of breath. She could also perform housework and shopping without shortness of breath. Dr. Wischer Bailey noted that plaintiff "has smoked one pack of cigarettes daily for thirty years and continues to do so despite her respiratory complaints." (*Id.*). Plaintiff also complained of a twenty-year history of back pain exacerbated by "[p]rolonged ambulation, standing or heavy lifting." (*Id.*). Plaintiff reported that she had not undergone any surgical procedures for her back pain "but had cortisone injections which were temporarily rewarding." (*Id.*). Plaintiff reported taking no medication for the pain. (*Id.*).

On examination, Dr. Wischer Bailey noted that plaintiff walked with a normal gait without ambulatory aids and was comfortable in both the sitting and standing positions. (Tr. 559). Plaintiff had "a mildly prolonged expiratory phase" but her "lungs [were] clear without rales, rhonchi, wheezes or evidence of cyanosis." (*Id.*). Examination of the cervical spine was within normal limits for flexion, extension, and rotation. (*Id.*). Plaintiff could bend forward at the waist without difficulty and her spine curvature was normal. (Tr. 560). She could stand on either leg and squat without difficulty and there was no evidence of paravertebral muscle spasm. The lumbar spinous processes were not tender and a straight leg raise test was normal. Lateral motion of the spine was normal, as was range of flexion of the hips. There was no tenderness in the hips and there was "no evidence of muscle weakness or atrophy." (*Id.*). Plaintiff's deep

14

tendon reflexes were brisk. Dr. Wischer Bailey characterized plaintiff's back examination as "entirely normal." (*Id.*).

Based on the examination, Dr. Wischer Bailey opined that plaintiff "appears capable of performing at least a moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects." (Tr. 561). Dr. Wischer Bailey opined that plaintiff "has no difficulty reaching, grasping, and handling objects" and has no environmental limitations. (*Id.*).

X-rays of the chest and spine were obtained as part of plaintiff's examination with Dr. Wischer Bailey. Based on the resulting images, radiologist Richard H. Laib, M.D., indicated that "the lungs are felt to be clear of active disease." (Tr. 562). There was no evidence of pleural fluid and the vascular patter was within the normal range. Images of the spine showed mild to moderate "[d]egenerative spurring at multiple levels." (*Id.*).

### *Dr. Twehues*

On July 15, 2013, consultative psychologist Jessica Twehues, Psy.D., examined plaintiff for disability purposes. (Tr. 627-32). Plaintiff reported that "[s]he was seeing a psychiatrist until a year ago when she could no longer afford the treatment." (Tr. 628). She was receiving psychiatric medication from her family care doctor. Plaintiff reported that she began receiving mental health treatment as a teenager and was diagnosed with bipolar disorder. She was hospitalized in 2009 for a suicide attempt, but had no suicidal thoughts in recent years. She found her psychiatric medicines to be helpful. (*Id.*). Plaintiff described her mood as "very depressed most of the time." (Tr. 628-29). She reported difficulties falling asleep without medicine and a poor appetite. (Tr. 629). She reported being easily agitated at times and feeling anxious, nervous, and tense most of the time. She reported difficulty focusing, easy

distractibility, frequent lateness, and frequent forgetfulness. "She reported that she is easily overwhelmed with stress and does not know how to handle stress well." (*Id.*).

On examination, Dr. Twehues noted that plaintiff "presented with tense posture and appeared restless." (Tr. 630). Plaintiff "appeared able to focus well in conversation but seemed to have difficulties focusing on a short-term verbal recall task. Her recent and remote recall appeared adequate." (*Id.*).

Dr. Twehues diagnosed plaintiff with mood and anxiety disorders and assigned a GAF score of 51.[4] (Tr. 631). Concerning plaintiff's ability to understand, remember, and carry out instructions, Dr. Twehues opined that plaintiff "appears capable of understanding instructions for simple tasks" but "may have difficulty understanding and retaining instructions for complex multi-step tasks due to what appear to be subaverage intellectual abilities." (*Id.*). Concerning plaintiff's ability to maintain attention, concentration, persistence, and pace, Dr. Twehues observed that plaintiff did not seem easily distracted but seemed to have difficulties focusing on a short-term verbal recall task. (Tr. 632). Dr. Twehues opined that "[d]ue to mood disturbances . . . she is likely to have difficulties sustaining focus for prolonged periods of time and may be easily distracted by negative thoughts and worry, slowing her performance on simple, repetitive tasks to a moderate extent." (*Id.*). Concerning plaintiff's ability to respond appropriately to supervisors and coworkers, Dr. Twehues opined that plaintiff "is likely to present as irritable" but "is expected to take orders from supervisors as needed." (*Id.*). Concerning plaintiff's ability to respond appropriately to work pressures, Dr. Twehues opined that plaintiff "is likely to have

---

[4] Individuals with GAF scores of 51 to 60 have "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

difficulties coping with major changes in her work routine, as well as everyday minor work place pressures due to feelings of depression, agitation, and anxiety." (*Id.*).

*Dr. Kinder*

On November 4, 2014, plaintiff was seen by pulmonologist Brett Kinder, M.D., on referral from Dr. Chang. (Tr. 748, 751). Dr. Kinder noted that plaintiff had a history of tobacco abuse and COPD and presented for evaluation and management of shortness of breath and cough. (Tr. 751). Plaintiff reported symptoms of shortness of breath on exertion, morning cough, and productive cough that began several years ago and gradually worsened since that time. Plaintiff reported "an exercise tolerance of approximately 1-2 blocks on the flat and 1 flight of stairs, limited primarily by dyspnea." (*Id.*). Dr. Kinder noted that plaintiff smoked one pack of cigarettes per day for 32 years and was not successful in attempts to quit smoking. (*Id.*). On respiratory examination, Dr. Kinder noted no abnormal findings. (Tr. 752). Dr. Kinder reviewed a CT scan of the chest from October 2014 that revealed mild emphysema. (Tr. 753). Dr. Kinder noted that plaintiff's cough was most likely chronic bronchitis from smoking and he encouraged smoking cessation. Dr. Kinder ordered lung function tests and a walk test to further evaluate the cause of plaintiff's shortness of breath. (*Id.*).

On respiratory examination at a November 18, 2014 appointment, Dr. Kinder noted no abnormal findings. (Tr. 766). Dr. Kinder diagnosed moderately severe COPD as the cause of plaintiff's shortness of breath. (Tr. 767). Pulmonary function testing performed that day by pulmonologist David Beck, M.D., revealed "[a] severe obstructive lung defect with severe air trapping and a moderate reduction in diffusing capacity." (Tr. 778). Dr. Beck opined that the test results were consistent with "severe" COPD. (Tr. 778-79).

17

In April 2015, Dr. Kinder noted that plaintiff still had shortness of breath and a cough that was worse in the morning. (Tr. 1050). On respiratory examination, Dr. Kinder noted no abnormal findings. (Tr. 1051).

*LifePoint Solutions*

On January 16, 2015, plaintiff sought mental health treatment from LifePoint Solutions on referral from Dr. Chang. (Tr. 995). Plaintiff's mental status examination as part of her initial assessment was normal except for a finding of mild anxiety. (Tr. 997). Plaintiff was diagnosed with bipolar disorder and rule out generalized anxiety disorder and was assessed a GAF score of 60. (Tr. 1000). Her level of care was described as "mild." (Tr. 1001).

At an initial therapy appointment with social worker Sarah Porter on February 25, 2015, plaintiff "showed minimal engagement." (Tr. 983). On March 9, 2015, Ms. Porter noted that plaintiff "engaged well and showed good insight into worry, anxiety, and pain." (Tr. 977). On March 23, 2015, Ms. Porter noted that plaintiff "shows good insight into life stressors." (Tr. 976). Plaintiff canceled her March 30, 2015 appointment and rescheduled. (Tr. 975). Plaintiff cancelled an April 13, 2015 appointment and rescheduled. (Tr. 1071).

On April 23, 2015, Ms. Porter noted on mental status examination that plaintiff showed signs of increased depression. (Tr. 1070). On April 30, 2015, Ms. Porter noted that plaintiff's affect was flat and her mood was upset. (Tr. 1069). On May 7, 2015, plaintiff reported increased stress due to her hearing for disability benefits. (Tr. 1068). On May 15, 2015, Ms. Porter noted that plaintiff's mood was upset and she "continues to show difficulty caring for self." (Tr. 1067). On May 19, 2015, plaintiff cancelled her appointment because of a migraine and rescheduled. (Tr. 1066). On May 22, 2015, plaintiff reported that she was "upset over inability to effectively . . . process information and formulate thoughts." (Tr. 1065).

*Test Results*

A March 2008 MRI of the lumbar spine revealed "[d]egenerative disc disease greatest at the L5/S1 level where there is a diffuse posterior disc bulge with a small central disc protrusion causing severe central spinal stenosis." (Tr. 555). The MRI also revealed moderate degenerative facet changes but no definite nerve root compression. (*Id.*).

An April 2009 MRI of the lumbar spine showed "a broad disc protrusion causing mild thecal sac effacement" at the L5-S1 level. (Tr. 553). This suggested "subtle neural effacement at L5-S1." (*Id.*).

On April 4, 2013, plaintiff underwent spirometric testing for disability purposes. (Tr. 567-73). The technician who administered the test observed "submaximal effort due to inconsistency in attempts." (Tr. 569). Test results showed that plaintiff's lung function was below predicted values. (*See* Tr. 573). Plaintiff's results worsened after treatment with albuterol. (*See id.*). In interpreting the results, Judy Brown, M.D., diagnosed moderate restrictive pulmonary disease and severe COPD that did not improve after treatment with albuterol. (*Id.*). However, Dr. Brown concluded the test was not a valid study due to submaximal effort after treatment with albuterol. (*See id.*).

An April 2014 MRI of the lumbar spine revealed "[m]ild to moderate central spinal stenosis at L4-L5 due to mild to moderate diffuse disc bulging and facet arthropathy." (Tr. 960). Additionally, there was "[m]oderate diffuse disc bulging at L5-S1 with some compression of both S1 nerve roots against the facet joints." (*Id.*). The MRI also revealed moderate facet arthropathy and "[a]t least mild spinal stenosis at L1-L2." (*Id.*).

*Emergency Treatment*

On October 11, 2014, plaintiff went to the emergency room for treatment of cough, congestion, sore throat, and fever. (Tr. 806). On respiratory examination, plaintiff's breathing was unlabored and her lungs were clear to auscultation bilaterally "although [she had] diffuse end expiratory wheezes on initial exam." (Tr. 811). A chest X-ray revealed chronic pleural thickening but no obvious pneumonia or edema. (Tr. 808). After breathing treatments, plaintiff experienced "a moderate resolution of her end expiratory wheezes." (Tr. 812). Plaintiff was discharged with prescriptions for antibiotics and prednisone. (*Id.*).

**E. Specific Errors**

In her first assignment of error on appeal, plaintiff argues the ALJ erred in relying on the consultative opinion of Dr. Wischer Bailey because that opinion "was vague, not based on a review of the entire record and did not constitute substantial evidence." (Doc. 9 at 2-5). In the second assignment of error, plaintiff contends the ALJ failed to give proper weight to the opinions of treating physicians Dr. Chang and Dr. Atluri. (*Id.* at 5-8). In the third assignment of error, plaintiff argues substantial evidence does not support the ALJ's RFC determination that plaintiff was capable of performing light work. (*Id.* at 8-9). In the fourth assignment of error, plaintiff contends that the VE's testimony supports a finding of disability "upon a proper consideration of all [plaintiff's] limitations." (*Id.* at 9-11). Because it is potentially dispositive of plaintiff's appeal, the Court will first consider plaintiff's assignment of error concerning the opinions of treating physicians Dr. Chang and Dr. Atluri.

**1. Substantial evidence supports the ALJ's consideration of Dr. Chang's opinion but does not support the ALJ's consideration of Dr. Atluri's opinion.**

*a. Substantial evidence supports the ALJ's assessment of Dr. Chang's opinion.*

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6) in determining what weight to give the opinion. *See Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(c)(2)(i)-(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical

specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted). *See also Wilson*, 378 F.3d at 544 (ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (citing SSR 96-2p, 1996 WL 374188 at *5 (1996)). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544).

The ALJ gave little weight to the July 12, 2013 opinion of Dr. Chang, plaintiff's primary care physician. (Tr. 30). The ALJ found the opinion "internally inconsistent" because Dr. Chang indicated that he could not provide physical limitations without performing a functional capacity examination, but he still opined as to some physical limitations. (*Id.*). The ALJ concluded that the opinion was not supported by "the record as a whole" or Dr. Chang's own treatment records, which showed he treated plaintiff only "for relatively minor problems such as urinary tract infections, cold symptoms, and general wellness examinations." (*Id.*). The ALJ noted that Dr. Chang also saw plaintiff for hypertension and diabetes, "which [plaintiff's] attorney expressly said at the hearing were not severe impairments." (*Id.*). The ALJ acknowledged that Dr. Chang also treated plaintiff's back pain, but found that plaintiff "received

conservative treatment, such as a recommendation by the doctor for back stretches." (*Id.*).
Finally, the ALJ noted that "Dr. Chang is a general practitioner, not a specialist." (*Id.*).

Here, the ALJ gave good reasons for not giving Dr. Chang's opinion controlling weight
and those reasons are substantially supported by the record. In his July 2013 opinion, Dr. Chang
opined that plaintiff would "frequently" experience both pain and stress severe enough to
interfere with the attention and concentration required to perform simple work tasks. (Tr. 625).
He indicated that plaintiff's limitations would cause her to be "off task" for 25% of the workday
and she would be unable to complete an eight-hour workday at least five days per month. (Tr.
626). He believed plaintiff would perform her job at 70% efficiency compared to an average
worker and would be unable to obtain or retain full-time employment in a competitive work
environment because "she has limited ability to handle stress." (*Id.*). As the ALJ properly noted,
these limitations are not supported by Dr. Chang's own treatment records or the record as a
whole.

As to Dr. Chang's own records, he noted in December 2012 that plaintiff's mood disorder
was stable on her current medications of Buspar, Prozac, and Lamictal. (Tr. 600, 602-03). Dr.
Chang's July 12, 2013 treatment note stated that plaintiff's depression and mood were stable.
(Tr. 705). In reviewing plaintiff's psychological symptoms, Dr. Chang noted that plaintiff was
negative for anxiety and depression. (Tr. 706). Dr. Chang's other treatment notes prior to his
July 2013 opinion contain no mention of more severe mental health symptomatology that would
support his opinions related to plaintiff's mental health.

His treatment notes are also inconsistent with his opinion that plaintiff would
"frequently" experience pain and stress severe enough to interfere with the attention and
concentration required to perform simple work tasks. The only reference to pain in Dr. Chang's

pre-opinion treatment notes was in April 2013 when plaintiff complained of lower back pain. (Tr. 575). However, Dr. Chang noted no tenderness in the lumbar spine on examination and indicated that mobility and curvature of the spine were normal. (Tr. 576). Further, Dr. Chang noted that plaintiff's 2008 MRI of the spine showed "very minimal degeneration." (Tr. 577). As the ALJ accurately noted, Dr. Chang recommended only that plaintiff "do back stretches" as the course of treatment for this pain. (Tr. 30, 577). This treatment regimen is inconsistent with Dr. Chang's July 2013 opinion that plaintiff's pain would frequently interfere with her ability to complete simple tasks.

The only pre-opinion reference to stress was Dr. Chang's July 2013 notation that plaintiff reported experiencing more stress and poor sleep. (Tr. 705). However, Dr. Chang also noted at that time that plaintiff's depression and mood were stable and she did not report any symptoms of anxiety and depression. (Tr. 705-06). On examination, plaintiff's mood and affect were appropriate. (Tr. 707). This stray remark that plaintiff was experiencing more stress— unaccompanied by any symptoms of increased anxiety or depression—is inconsistent with Dr. Chang's opinion that plaintiff's stress would frequently interfere with her ability to complete simple tasks. In short, the lack of abnormal mental health findings in Dr. Chang's treatment records is inconsistent with the extensive limitations he identified in his opinion. Thus, the ALJ properly discounted the conclusory findings in Dr. Chang's opinion concerning the degree of plaintiff's mental functional limitations. *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.").

Substantial evidence also supports the ALJ's finding that Dr. Chang's opinion concerning plaintiff's mental limitations is not supported by the record as a whole. For example, Dr. Cone's

October 2011 mental status examination of plaintiff was unremarkable and Dr. Cone noted that plaintiff was "doing well" on her medication regimen. (Tr. 1016-17). Additionally, Dr. Cone assessed a GAF score of 65, which is indicative of only mild symptomatology. (Tr. 1016-17); DSM-IV at 34. Although Dr. Cone characterized plaintiff's depression as severe in January 2012, by March 2012 plaintiff presented with only mild depression and her mental status examination was unremarkable. (Tr. 1019, 1025, 1029). In June 2012, plaintiff reported being more depressed but having improved anxiety with Buspar. (Tr. 1039). Dr. Cone increased plaintiff's Prozac dosage to address plaintiff's depression. (*Id.*). In December 2012, Dr. Chang indicated that this increased dosage had stabilized plaintiff's mood disorder. (*See* Tr. 600).

In July 2013, consultative psychologist Dr. Twehues noted that plaintiff "appeared able to focus well in conversation but seemed to have difficulties focusing on a short-term verbal recall task. Her recent and remote recall appeared adequate." (Tr. 630). In opining on plaintiff's ability to concentrate, Dr. Twehues observed that plaintiff did not seem easily distracted, but found that "due to mood disturbances . . . she is likely to have difficulties sustaining focus for prolonged periods of time and may be easily distracted by negative thoughts and worry, slowing her performance on simple, repetitive tasks to a moderate extent." (Tr. 632).

Dr. Twehues' opinion could support Dr. Chang's opinion that plaintiff's symptoms would interfere with her ability to maintain attention and concentration. (*See* Tr. 625, 632). The ALJ gave great weight to Dr. Twehues' opinion and addressed this concern by limiting plaintiff to "simple, routine, repetitive tasks performed in a work environment free of fast paced production requirements, involving only simple work-related decisions with few if any workplace changes." (Tr. 23, 29). However, neither Dr. Cone's nor Dr. Twehues' records as described above support Dr. Chang's opinions that plaintiff would: (1) be "off task" for 25% of

the workday; (2) be unable to complete an eight hour workday at least five days per month; (3) perform her job at only 70% efficiency; and (4) be unable to obtain or retain full-time work because of a "limited ability to handle stress." (Tr. 626). Thus, substantial evidence supports the ALJ's conclusion that the record as a whole does not support Dr. Chang's opinion.

For these reasons, the Court determines that the ALJ gave good reasons for not giving Dr. Chang's opinion controlling weight. *See Gayheart*, 710 F.3d at 376.

Moreover, substantial evidence supports the ALJ's consideration of the regulatory factors in weighing Dr. Chang's opinion. *See* 20 C.F.R. § 404.1527(c)(2)-(6). As explained above, substantial evidence supports the ALJ's findings that Dr. Chang's opinions were unsupported and inconsistent with the record as a whole. *See id.* § 404.1527(c)(3)-(4). The ALJ also properly noted that plaintiff was a general practitioner, not a specialist in mental health. (Tr. 30); 20 C.F.R. § 404.1527(c)(5). Substantial evidence supports these reasons for discounting Dr. Chang's opinion.

Based on the foregoing, substantial evidence supports the ALJ's assessment of Dr. Chang's opinion.

        b. *Substantial evidence does not support the ALJ's assessment of Dr. Atluri's opinion.*

The ALJ also gave "very little weight" to the opinions of other treating physicians "made well before the alleged onset date." (Tr. 30). The ALJ applied this analysis to the opinion concerning plaintiff's functional capacity expressed in Dr. Atluri's letter summarizing plaintiff's April 2009 appointment. (*See id.*) (citing Tr. 840). The ALJ found Dr. Atluri's opinion to be "too remote in time to reliably indicate [plaintiff's] functioning during the relevant period." (*Id.*). Further, the ALJ concluded that Dr. Atluri's opinion was not consistent with the objective medical evidence of record or the opinion of Dr. Wischer Bailey. (*Id.*).

The ALJ gave "very little weight" to Dr. Atluri's opinion because it was "too remote in time to reliably indicate [plaintiff's] functioning during the relevant period." (Tr. 30). This may be a good reason for not giving controlling weight to Dr. Atluri's April 2009 opinion that plaintiff was "able to function only 30-40% of her full function capability" because that opinion was provided years before the alleged November 30, 2011 disability onset date. (Tr. 840). However, Dr. Atluri began treating plaintiff again in May 2014. (Tr. 842). At that time, Dr. Atluri reported that plaintiff was "able to function only 40% of her full function capacity." (*Id.*). The ALJ did not give any indication that she considered this May 2014 opinion when she gave Dr. Atluri's April 2009 opinion very little weight for falling outside the relevant time period. Because this May 2014 opinion falls within the time period relevant to the disability determination, remoteness in time is not a good reason for rejecting Dr. Atluri's opinion.

The Commissioner argues that the statement in Dr. Atluri's treatment note that plaintiff is only able to function at 40% of her functional capacity "is clearly not Dr. Atluri's objective observations of Plaintiff, nor his conclusions regarding her capabilities. Instead, he is simply recording Plaintiff's self-reported complaints." (Doc. 14 at 4-5). This argument is not well-taken. It is not clear from the face of Dr. Atluri's opinion that this statement is plaintiff's self-report and not Dr. Atluri's own conclusion based on his own examination of plaintiff and review of the medical record including the 2008 and 2014 MRIs. (*See* Tr. 842-43). Also cutting against the Commissioner's argument on appeal is the fact that the ALJ regarded Dr. Atluri's 2009 statement that plaintiff was "able to function only 30-40% of her full function capability" as an opinion "regarding [plaintiff's] functional abilities" to which the ALJ gave very little weight. (Tr. 30; 840). The Commissioner has not provided any rationale to support the ALJ's

considering that 2009 statement as an opinion but not considering as an opinion the similar 2014 statement that plaintiff was "able to function only 40% of her full function capacity." (Tr. 842).

Further, the ALJ's failure to consider Dr. Atluri's 2014 statement in weighing his opinion is not harmless error. This is not a case where "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it." *Wilson*, 378 F.3d at 547. In his 2014 statement, Dr. Atluri notes that he reviewed plaintiff's recent MRI from April 2014 as well as plaintiff's March 2008 MRI. (Tr. 842). Plaintiff's March 2008 MRI revealed degenerative disc disease, including a "diffuse posterior disc bulge" at L5-S1 "causing severe central spinal stenosis." (Tr. 555). The MRI also revealed moderate degenerative facet changes. (*Id.*). The April 2014 MRI revealed "[m]ild to moderate central spinal stenosis at L4-L5 due to mild to moderate diffuse disc bulging and facet arthropathy." (Tr. 960). Additionally, the 2014 MRI still showed "[m]oderate diffuse disc bulging at L5-S1 with some compression of both S1 nerve roots against the facet joints." (*Id.*). The MRI also revealed moderate facet arthropathy and "[a]t least mild spinal stenosis at L1-L2." (*Id.*).

Although Dr. Wischer Bailey characterized plaintiff's February 2013 back examination as "entirely normal" and noted no tenderness or evidence of muscle weakness, she also ordered x-rays of the lumbar spine that showed mild to moderate degenerative spurring at multiple disc levels. (Tr. 560, 562). There is no indication in Dr. Wischer Bailey's opinion that she reviewed the 2008 MRI and her February 2013 opinion was rendered more than a year before the April 2014 MRI that Dr. Atluri reviewed before stating in May 2014 that plaintiff was "able to function only 40% of her full function capacity." (Tr. 842). Also, Dr. Wischer Bailey examined plaintiff only once, while Dr. Atluri had a longstanding treatment relationship with plaintiff. *See Walters*, 127 F.3d at 530-31 ("In general, the opinions of treating physicians are accorded greater

28

weight than those of physicians who examine claimants only once."). Thus, even though Dr.

Wischer Bailey reached a different conclusion than that expressed in Dr. Atluri's May 2014

statement, in this context that difference of opinion does not render Dr. Atluri's statement "so

patently deficient that the Commissioner could not possibly credit it." *Wilson*, 378 F.3d at 547.

Finally, the Court notes that the ALJ did not acknowledge that Dr. Atluri was a treating

physician and a specialist and did not assess the regulatory factors in deciding to give his opinion

"very little weight." Unlike Dr. Wischer Bailey who examined plaintiff only once, Dr. Atluri

had a longstanding treating relationship with plaintiff and examined her frequently. *See* 20

C.F.R. § 404.1527(c)(2)(i)-(ii); *Wilson*, 378 F.3d at 544. Dr. Atluri is a specialist in pain

management. *See* 20 C.F.R. § 404.1527(c)(5). Further, Dr. Atluri reviewed the 2008 and 2014

MRI evidence before stating that plaintiff was "able to function only 40% of her full function

capacity." (Tr. 842); *see* 20 C.F.R. § 404.1527(c)(3)-(4). In short, the ALJ failed to conduct an

evaluation of Dr. Atluri's opinion under the regulatory factors.

Accordingly, because the ALJ neither gave good reasons for rejecting Dr. Atluri's

opinion nor properly weighed the regulatory factors, plaintiff's second assignment of error

should be sustained as to Dr. Atluri's opinion.

### 2. The Court need not reach plaintiff's remaining assignments of error.

It is not necessary to address plaintiff's remaining assignments of error. Because this

case should be remanded for the ALJ to reconsider and reweigh the medical opinions of record,

this may impact the remainder of the ALJ's analysis, including the RFC assessment and the

proper questions to be raised before a VE. In any event, even if these assignments of error have

merit, the result would be the same, i.e., remand for further proceedings and not outright reversal

for benefits. *Mays v. Comm'r of Soc. Sec.*, No. 1:14-cv-647, 2015 WL 4755203, at *13 (S.D.

Ohio Aug. 11, 2015) (Report and Recommendation) (Litkovitz, M.J.), *adopted*, 2015 WL 5162479 (S.D. Ohio Sept. 3, 2015) (Dlott, J.).

**III.  This matter should be reversed and remanded for further proceedings.**

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the undersigned notes that all essential factual issues have not been resolved in this matter. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).  On remand, the ALJ should (1) properly weigh the medical opinions of record; (2) reassess plaintiff's RFC; and (3) pose an appropriate hypothetical or hypotheticals to a VE after properly weighing the medical opinions and reassessing plaintiff's RFC.

<strong>IT IS THEREFORE RECOMMENDED THAT</strong>:

The decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

Date:  7/20/17

Karen L. Litkovitz
United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

PAMELA S. WOODRUFF,
     Plaintiff,

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
     Defendant.

Case No. 1:16-cv-798
Black, J.
Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).